Filed 12/2/21  Twentieth Century Fox Film Corp. v. Netflix CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| TWENTIETH CENTURY FOX FILM CORPORATION, et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> NETFLIX, INC., <br><br> Defendant and Appellant. | B304022 <br><br> (Los Angeles County Super. Ct. No. SC126423) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Marc D. Gross, Judge.  Affirmed.

Orrick, Herrington, & Sutcliffe, Karen G. Johnson-McKewan, Russell P. Cohen, Catherine Y. Lui, Daniel Justice, Alexander Fields, Sachi Schuricht, Eric A. Shumsky, Jeremy Peterman, Anne Savin, Jennifer Keighley, Lynne C. Hermle, and Jason K. Yu, for Defendant and Appellant.

O'Melveny & Meyers, Daniel M. Petrocelli, Molly M. Lens, Jonathan D. Hacker, and Leah Godesky, for Plaintiffs and Respondents.

_____

## I.  INTRODUCTION

The trial court granted summary adjudication in favor of Twentieth Century Fox Film Corporation and Fox 21, Inc. (collectively Fox) on their unfair competition claim[1] and entered a judgment enjoining Netflix Inc. (Netflix) from soliciting employees under contract with Fox.  On appeal, Netflix contends there are triable issues on the UCL claim, two affirmative defenses to that claim, and two cross-claims.  Netflix also maintains the injunction is an invalid restraint on employee mobility.  We affirm.

## II.  FACTUAL BACKGROUND[2]

### A.  *Waltenberg Agreement*

Marcos Waltenberg joined Fox in 2003 and on December 9, 2014, he and Fox entered into a fixed-term

_____

[1]   Fox brought the claim under the Unfair Competition Law (the UCL), Business and Professions Code section 17200 et seq.

[2]   We recite the facts in the light most favorable to the party opposing summary adjudication.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

employment agreement (Waltenberg agreement) pursuant to which Fox agreed to employ him for two years, from January 1, 2015, to December 31, 2016. Waltenberg's salary during the contract term was below the market 25th percentile for his position. The Waltenberg agreement included a unilateral option for Fox to extend the two-year term for an additional two-year period. The agreement also provided that Fox could pursue injunctive and other equitable relief to prevent Waltenberg from breaching his agreement.

On November 6, 2015, Netflix sent a written employment offer to Waltenberg which he executed on November 7, 2015. Netflix agreed to more than double Waltenberg's Fox salary. Netflix knew when it sent the offer that Waltenberg had entered into a fixed-term agreement with Fox.

On December 16, 2015, Netflix agreed in writing to defend and indemnify Waltenberg against any action taken by Fox in response to his acceptance of Netflix's employment offer. Netflix also paid a law firm to represent Waltenberg regarding the employment offer.

After Waltenberg tendered his notice to Fox, he offered to stay for a limited period to assist in the transition to a new employee, but Fox refused his offer. Waltenberg stopped working at Fox on January 22, 2016.

Fox hired Hugo Domenech to finish the outstanding work Waltenberg left behind, paying him £21,690.41 for work performed between February 5, 2016, and March 18, 2016. Fox then promoted a lower-salaried employee, Carlos Castillo, to fulfill Waltenberg's duties. Fox did not pay Waltenberg through the full term of his agreement.

Waltenberg began working at Netflix on January 25, 2016.

B.    *Flynn Agreement*

Tara Flynn joined Fox in 2010 and was under contract with Fox from 2012 until her departure in 2016. Flynn's agreements with Fox, collectively, bound her to work for Fox for over seven consecutive years. According to Netflix, at all times from 2012 onward, Flynn's salary at Fox was below the market 25th percentile for her position. Fox disputed this contention, asserting that in 2015, Flynn's contract was at the mid-point of market.

On November 19, 2015, Fox and Flynn entered into a fixed-term employment agreement pursuant to which Fox agreed to employ her for two years, from November 19, 2015, to November 18, 2017 (Flynn agreement). The Flynn agreement included a unilateral option for Fox to extend the two-year term for an additional two-year period and also provided that Fox was entitled to pursue injunctive and other equitable relief to prevent Flynn from breaching her agreement.

On August 8, 2016, Netflix sent Flynn a written employment offer which she executed on August 9, 2016. Netflix agreed to double Flynn's Fox salary. Netflix knew when it sent the offer that Flynn had entered into a fixed-term agreement with Fox.

On August 9, 2016, Netflix agreed in writing to defend and indemnify Flynn against any action taken by Fox in response to her acceptance of Netflix's employment offer. Netflix also paid a law firm to represent Flynn in connection with the employment offer. Flynn's last day of work at Fox was September 2, 2016. Prior to that date, Netflix knew the term of her agreement with Fox did not expire until November 18, 2017. Fox did not receive

4

the benefit of Flynn's services from September 2, 2016, through November 18, 2017.[3]  Flynn began working at Netflix on September 6, 2016.

C.    *Fox's Employment Contracts and Practices*

Fox's fixed-term agreements, including the Waltenberg and Flynn agreements, contained nonnegotiable provisions, including provisions entitling Fox to injunctive relief and a unilateral option to extend the fixed-term contract.

In addition, Fox's fixed-term agreements generally contained a provision prohibiting employees from disclosing or communicating to competitors confidential or trade secret information which they acquired during the course of their employment with Fox, as well as a nonsolicitation provision preventing employees during the term of their employment, and for a two-year period thereafter, from inducing or soliciting other Fox employees to render services for any other person, firm, or corporation.

Some of Fox's fixed-term contracts also contained a "no-shop" provision that prohibited employees from "'seek[ing] or negotiat[ing]'" for new employment more than 90 days before their Fox employment agreement expired.

None of Fox's fixed-term agreements included a provision permitting the employee to terminate the agreement prior to the end of the term.

---

[3]    The parties disputed whether the new employee Fox hired to purportedly replace Flynn was a direct replacement as that employee was hired for a different department.

Fox told its employees that their agreements obligated them to work for Fox (and no one else) through the term of their agreements and sent employees and prospective employers cease and desist letters that threatened to enforce its legal rights.

Fox, however, terminated employees prior to the expiration of their fixed-term employment pursuant to its contract payout status policy and practice.

Certain Fox executives admitted that they used fixed-term agreements to "'lock in'" and "gain 'control [of]'" and maintain "'leverage'" over employees. Whether a Fox employee had received interest from a competitor was a motivating factor in offering a fixed-term contract. Fox frequently offered employees new fixed-term agreements while they had significant time remaining on their existing contracts and Fox made raises and promotions contingent on signing a fixed-term agreement. Fox also refused to grant releases to fixed-term employees who joined competitors during the term of their agreement. But Fox would agree to release fixed-term employees to competitors in exchange for something of value from the competitor.

According to Netflix, at least 127 Fox employees had entered into sequential fixed-term contracts that, together, provided an employment term that was longer than seven years. Fox maintained, however, that when fixed-term employees worked for Fox for more than seven consecutive years, they did so under new and superseding agreements that were negotiated.

D.  *Netflix's Continuing Recruitment*

From the time Fox filed its complaint against Netflix on September 16, 2016, until August 31, 2018, Netflix offered

6

employment to 14 individuals who were employed by Fox under fixed-term contracts that had not expired at the time of the offers. During that same time frame, Netflix hired eight Fox employees who had fixed-term agreements that had not expired at the time Netflix hired them.

## III.   PROCEDURAL BACKGROUND

### A.   *Fox's Complaint*

On September 16, 2016, Fox filed a complaint against Netflix asserting three causes of action for:  tortious interference with the Waltenberg agreement; tortious interference with the Flynn agreement; and unfair competition in violation of the UCL. Fox prayed for compensatory and punitive damages and a permanent injunction against Netflix enjoining it from interfering with any of Fox's fixed-term employment agreements.

### B.   *Netflix's Cross-complaint*

Netflix answered the complaint and, in its operative second amended answer (filed during the proceedings on Fox's summary judgment motion), asserted affirmative defenses alleging, among other things, that:  Fox's fixed-term employment agreements were void as against public policy; Netflix's interference with Fox's fixed-term agreements was justified; and Fox's fixed-term agreements were unconscionable.

Netflix also filed a cross-complaint and, in the operative amended cross-complaint (filed during the proceedings on Fox's summary judgment motion), asserted claims for unfair

7

competition in violation of the UCL and declaratory relief. On its UCL claim, Netflix prayed for a declaration that Fox's contracting practices were unfair, unlawful, and fraudulent and an order enjoining Fox from continuing to use fixed-term employment agreements against its employees. On its declaratory relief claim, Netflix sought a declaration that Fox's fixed-term employment agreements were unenforceable and could not be used to prohibit its employees from seeking employment with other companies and a declaration that Fox was estopped from enforcing its fixed-term employment agreements to prohibit employees from seeking employment with other companies.

C.     *Summary Judgment and Adjudication Motions*

Both parties filed summary judgment or adjudication motions. In its motion for summary adjudication of Fox's UCL claim,[4] Netflix contended that the injunction sought by Fox contravened California law prohibiting the specific performance of personal services contracts.

Fox's motion sought summary judgment on its complaint, Netflix's cross-complaint, and Netflix's public policy and unconscionability affirmative defenses. In the alternative, Fox sought summary adjudication of its two tortious interference claims, its UCL claim, Netflix's public policy and

---

[4]     The ruling on Netflix's summary adjudication motion is not at issue in this appeal.

8

unconscionability defenses,[5] and Netflix's cross-claims for violation of the UCL and declaratory relief.

D.    *Rulings*

The trial court held an initial hearing on the parties' respective motions during which it denied Netflix's motion on Fox's UCL claim. Several months later, the court held a continued hearing during which Fox stated it was "willing to submit on the basis of a dollar each" on the first two causes of action. The court then issued a final order on Fox's motions, denying its summary judgment motion on its complaint. The court also denied Fox's requests for summary adjudication of the two tortious interference claims, ruling that Netflix had submitted evidence showing there was a triable issue of fact on both tort claims "as to resulting damages." The court noted, as an example, that "Netflix submitted evidence suggesting [Fox] saved time and money by promoting Castillo to Waltenberg's position because [Fox] did not have to train someone from the

_____

[5]    As the trial court noted in its final ruling on Fox's summary judgment motion, Netflix asserted a justification defense in its second amended answer, which was filed with leave of court *after* the first hearing on Fox's motion. As the court also noted, Fox did not separately move for summary adjudication of that defense. In opposition to Fox's summary judgment motion, however, Netflix argued that there were disputed issues of fact as to whether "'the nature of [its] conduct'" justified any alleged interference with Fox's contracts, an argument that the court considered and rejected. But Netflix's separate statements in opposition to Fox's motion did not set forth any independent factual basis in support of that defense, beyond the facts in support of the public policy and unconscionability defenses.

9

outside and paid Castillo significantly less than Waltenberg." The court also concluded that Fox did not satisfy its burden to submit evidence showing resulting damages for Netflix's inducement of Flynn's breach of her fixed-term agreement. According to the court, Fox's "request for $1[.00] in [nominal] damages does not save the motion for summary judgment/adjudication because . . . there is a triable issue of material fact as to whether [Fox] suffered any resulting damages, which cannot be determined via the instant motion."

The trial court, however, granted summary adjudication on Fox's UCL claim, finding that Fox had demonstrated economic injury in the form of out-of-pocket losses, "contract disruption," "business disruption," and injury to its property in the form of lost contract rights. The court therefore concluded that Fox was entitled to injunctive relief under the UCL as follows: "Netflix shall not solicit employees who are subject to *valid* [f]ixed-[t]erm [e]mployment [a]greements with Fox or induce such employees to breach their *valid* [f]ixed-[t]erm [e]mployment [a]greements with Fox."

In addition, the trial court granted Fox's summary judgment/adjudication motion on Netflix's public policy defense, finding, among other things, that certain of the contract provisions Netflix challenged as invalid or illegal were severable from the fixed-term provisions of Fox's employment agreements.[6] Finally, the court granted Fox's summary judgment/adjudication motion on Netflix's cross-claims for violation of the UCL and declaratory relief, concluding, among other things, that Netflix

---

[6] The court also granted Fox's summary adjudication motion on Netflix's unconscionability defense, a ruling that Netflix does not challenge on appeal.

10

had failed to join the affected Fox employees as necessary and indispensable parties.

E.     *Judgment*

Following the rulings on its motions, Fox dismissed without prejudice its two remaining tortious interference claims, and the trial court thereafter entered a judgment that permanently enjoined Netflix from soliciting Fox employees subject to fixed-term employment agreements.  Consistent with the summary adjudication order on the UCL claim, the judgment provided: "Netflix, [] both individually and through any of its agents, servants, employees, and representatives, either alone and/or in concert with others, shall not solicit employees who are subject to *valid* [f]ixed-[t]erm [e]mployment [a]greements with [Fox] or induce such employees to breach their *valid* [f]ixed-[t]erm [e]mployment [a]greements with [Fox]."

Netflix timely appealed from the judgment.

## IV.   DISCUSSION

A.     *Standard of Review*

""""A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c); see also *id.*, § 437c, subd. (f) [summary adjudication of issues].)"""" (*State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017.)  "We review the trial court's decision [on a summary judgment motion] de novo, considering

all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

"In moving for summary judgment, a 'plaintiff . . . has met' his 'burden of showing that there is no defense to a cause of action if' he 'has proved each element of the cause of action entitling' him 'to judgment on that cause of action. Once the plaintiff . . . has met that burden, the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The defendant . . . may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' (Code Civ. Proc., § 437c, subd. (o)(1).)" (*Aguilar*, *supra*, 25 Cal.4th at p. 849.)

B.     *Evidentiary Rulings on Fox's Objections*

Netflix contends that the trial court erred by sustaining Fox's objections to three expert reports opining on the effects of Fox's contracting practices on its employees' ability to obtain alternative employment and on Netflix's ability to hire skilled employees. Netflix also contends the court erred by sustaining Fox's objections to 14 "admissions" purportedly made by various Fox employees "about the company's contracting practices." According to Netflix, the court's rulings were made "without explanation" and were otherwise "indefensible." Fox counters

12

that Netflix waived its challenges to the court's rulings by not affirmatively demonstrating error on appeal. We agree.

An appealed judgment or order, including an order sustaining evidentiary objections, is presumed correct. "'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) As the appellant, Netflix has the burden of overcoming the presumption of correctness. That burden includes providing an adequate record (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574–575) and reasoned argument and citations to authority on each point raised (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368). If an appellant asserts a point, but fails to support it with reasoned argument and citations to authority, the appellate court may treat it as waived or forfeited, and pass it without consideration. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; *Taylor v. Roseville Toyota, Inc.* (2006) 138 Cal.App.4th 994, 1001, fn. 2 [contention forfeited when "merely asserted without argument or authority"].)

Here, Netflix omitted Fox's objections in the appellant's appendix and failed to discuss in the opening brief each of the rulings it challenged in relation to the specific item of evidence to which an objection was raised. Instead, Netflix complained that "[w]e don't know which among Fox's laundry list of objections the court sustained . . . ." And, although it asserted generally that the three expert reports had adequate foundation and were otherwise relevant, it made no further effort to explain, as to each expert, how he was qualified to give the opinions proffered or why each individual opinion was relevant to an issue in dispute. Netflix similarly concluded that the admissions evidence was not

13

excludable as hearsay and was otherwise relevant, but did not discuss each item of evidence in relation to the specific objections that were sustained. Instead, Netflix pointed to the location of the reports and admissions evidence in the record and urged us to find the error. In short, neither Netflix's original record nor its brief was adequate to overcome the presumption of correctness as applied to the challenged evidentiary rulings.

Moreover, even if Netflix had affirmatively demonstrated error as to each opinion and item of admissions evidence, it made no effort to demonstrate prejudice. At best, Netflix argued that the expert opinions were relevant to the issue of whether Fox's contracting practices violated public policy and the admissions were relevant to show Fox's practices. A showing of relevance, however, does not establish the requisite prejudice. Prejudice is not presumed; it requires an affirmative showing of injury from the error, i.e., that it is reasonably probable the trial court would have denied summary adjudication on the UCL claim if the proffered opinion and admissions evidence had been considered. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) Netflix's opening brief fell short of carrying that burden.

In its reply brief, Netflix claims to have cured any record or briefing deficiencies by including Fox's objections in its reply appendix and discussing prejudice. But even if we assume, without deciding, that Netflix cured the deficiencies in the record by its belated reply appendix, it cannot for the first time in a reply brief raise issues or arguments that should have been fully addressed in its opening brief. (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178; *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10.)

14

C.	*Summary Judgment on Fox's UCL Claim*

Netflix contends that the trial court erred by granting summary adjudication on Fox's UCL claim because there was a triable issue concerning damages.  According to Netflix, because the court found a triable issue on damages with respect to the two substantive interference claims, summary adjudication of the UCL claim was improper.

1.	Legal Principles:  the Unlawful Prong

"[The UCL's] scope is broad.  . . . [I]t does not proscribe specific practices.  Rather, as relevant here, it defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.'  ([Bus. & Prof. Code,] § 17200.)  Its coverage is 'sweeping, embracing "'anything that can properly be called a business practice and that at the same time is forbidden by law.'"'  [Citations.]  It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.'  [Citations.]  By proscribing 'any unlawful' business practice, '[Business and Professions Code] section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable."  (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180, fn. omitted.)  "'Virtually any law—federal, state or local—can serve as a predicate for a [UCL] action.'"  (*Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176, 1185.)

Under the UCL's unlawful prong, courts have held that, if the underlying statutory or tort claim upon which the UCL claim is predicated is ruled invalid, the UCL claim also fails, as it "stand[s] or fall[s] depending on the fate of the antecedent substantive causes of action." (*Krantz v. BT Visual Images* (2001) 89 Cal.App.4th 164, 178; *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, 950 ["when the underlying legal claim fails, so too will a derivative UCL claim"].)

2.      Analysis

Although the elements of Fox's tortious interference claims[7] require a showing of "resulting damage," the "*extent* of damage is not an element of a cause of action in tort, and the general rule [in the statute of limitations context] is that the cause of action is complete on the sustaining of 'actual and appreciable harm,' on which the recoverable damages would be more than nominal. (*Davies v. Krasna* [(1975)] 14 Cal.3d [502,] 514.)" (*Evans v. Eckelman* (1990) 216 Cal.App.3d 1609, 1620 [emphasis added].) Thus, for purposes of establishing its right to relief under the UCL's unlawful prong, all Fox was required to show was that it suffered actual harm and that its resulting

_____

[7]      "Tortious interference with contractual relations requires '(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1141 (*Ixchel*).)

16

damages would have been more than nominal.[8]  Such a showing would establish a completed tort under the elements of the tortious interference claims upon which a UCL claim could be predicated.

Here, the undisputed evidence of Netflix's conduct showed an unlawful practice, namely, intentional interference with the fixed-term agreements of both Waltenberg and Flynn, as well as continuing interference with the fixed-term agreements of more than a dozen other Fox employees.  The undisputed evidence also showed that both employees' salaries from Fox were below market, at least for most of the years of the employees' employment with Fox, and that Netflix specifically targeted both of them, offering to double their salary and to defend and indemnify them against any claims brought by Fox.  That

---

[8]     The term "nominal damages," in this sense, describes a claim as to which there are no actual damages, but the law nevertheless recognizes a technical invasion of a right or duty. (Civ. Code § 3360 ["When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages"]; see *Avina v. Spurlock* (1972) 28 Cal.App.3d 1086, 1088 ["Nominal damages are properly awarded in two circumstances:  (1) Where there is no loss or injury to be compensated but where the law still recognizes a technical invasion of a plaintiff's rights or a breach of a defendant's duty; and (2) although there have been real, actual injury and damages suffered by a plaintiff, the extent of plaintiff's injury and damages cannot be determined from the evidence presented"]; *Kluge v. O'Gara* (1964) 227 Cal.App.2d 207, 209–210 ["The term 'nominal damages' describes two types of award—a trifling or token allowance for mere technical invasion of a right, without actual damage; and the very different allowance made when actual damages are substantial, but their extent and amount are difficult of precise proof"].)

17

evidence demonstrated that the loss of their contracted services prior to the expiration of the terms of their agreements caused injury to Fox. (See *Ventura County Employees' Retirement Association v. Pope* (1978) 87 Cal.App.3d 938, 954 ["[An] action for loss of services is a proprietary cause of action, i.e., one for damages for wrongful interference with a contractual right to services, and constitutes a claim for damages for injury to a property right"].) That Fox, at the summary judgment stage, did not produce undisputed evidence as to the extent and amount of its injury was not fatal to its UCL claim because its evidence of actual injury completed the tort claims, at least for purposes of obtaining injunctive relief under the UCL's unlawful prong. (See e.g., *Imperial Ice Co. v. Rossier* (1941) 18 Cal.2d 33, 38–39 [holding that injunction is the proper remedy for intentional interference with contract where damages would be inadequate]; *Steroid Hormone Product Cases* (2010) 181 Cal.App.4th 145, 154 ["The focus of the UCL is 'on the defendant's conduct, rather than the plaintiff's damages . . .'"]; see also *Clemente v. California* (1985) 40 Cal.3d 202, 219 ["If [the] plaintiff's inability to prove his damages with certainty is due to [the] defendant's actions, the law does not generally require such proof"].)

Whether Fox, following the departure of Waltenberg and Flynn, enjoyed net savings by hiring a lower-salaried replacement or shifting responsibilities to a different department, may be relevant to whether Fox met its burden to mitigate damages. (*Valle De Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691.) But it is irrelevant to the issue of whether Fox could meet the elements of its cause of action for tortious interference because "[t]ypically, the rule of mitigation of damages comes into play when the event producing injury or damage has already

occurred and it then has become the obligation of the injured or damaged party to avoid continuing or enhanced damages through reasonable efforts." (*Ibid.*) Further, the very purpose of injunctive relief, to prevent *future* bad acts, would be defeated if, as Netflix contends, the proponent of such relief were required to demonstrate that it *had not* enjoyed savings as a result of defendant's conduct.

D.    *Public Policy Defense*

Netflix next contends that the trial court erred in granting summary adjudication of the UCL claim because there were triable issues concerning whether the Waltenberg and Flynn agreements were void as against public policy. According to Netflix, Fox used a series of interrelated contract provisions and practices to limit employee mobility which violated the established public policy protecting an employee's right to move freely among jobs and an employer's right to compete for skilled employees. Netflix also contends that Fox's practices violate Business and Professions Code section 16600 (section 16600) and other statutes that prohibit specific performance of personal services contracts, as well as Labor Code section 2855 which prohibits personal services agreements for terms of longer than seven years.

1.    Legal Principles

To be liable for inducing breach of contract, there must be a valid contract. (*Pacific Gas & Electric v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126.) A contract that is contrary to

public policy is generally considered invalid and unenforceable. "'Whether a contract is illegal or contrary to public policy is a question of law to be determined from the circumstances of each particular case.' [Citation.] 'Before labeling a contract as being contrary to public policy, courts must carefully inquire into the nature of the conduct, the extent of public harm which may be involved, and the moral quality of the conduct of the parties in light of the prevailing standards of the community.' [Citation.]" (*Dunkin v. Bosky* (2000) 82 Cal.App.4th 171, 183.)

Even if a court determines that one or more of the provisions in an agreement are unenforceable because they violate public policy, it is not required to void the agreement in its entirety if the offending terms can be severed or restricted. (*Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 658 ["courts may enforce contracts that illegally contravene public rights, so long as the objectionable provisions can be severed"] (*Abramson*).) "'In determining whether to sever or restrict illegal terms rather than voiding the entire contract, "[t]he overarching inquiry is whether "'the interests of justice . . . would be furthered'" by severance." [Citation.] Significantly, the strong legislative and judicial preference is to sever the offending term and enforce the balance of the agreement: Although "the statute appears to give a trial court some discretion as to whether to sever or restrict the unconscionable [or illegal] provision or whether to refuse to enforce the entire agreement[,] . . . it also appears to contemplate the latter course only when an agreement is 'permeated' by unconscionability [or illegality]." [Citation.]'" (*Dotson v. Amgen, Inc.* (2010) 181 Cal.App.4th 975, 986.)

"In *Armendariz* [*v. Foundation Health Pyschcare Services, Inc.* (2000) 24 Cal.4th 83 (*Armendariz*)], the California Supreme

20

Court[, in the unconscionability context,] identified several factors that affect severability. ([*Id*.] at pp. 124–125.) Each relates to whether the contract is permeated by unconscionability or illegality. In simple terms, courts will not sever when the 'good cannot be separated from the bad, or rather the bad enters into and permeates the whole contract, so that none of it can be said to be good . . . .' [Citations.]

"One factor examines the contract's essential object. 'If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.' (*Armendariz, supra*, 24 Cal.4th at p. 124.)

"A second measure of the pervasiveness of a contract's illegality or unconscionability is whether the agreement contains more than one objectionable term. (*Armendariz, supra*, 24 Cal.4th at p. 124.) The fact that an 'arbitration agreement contains more than one unlawful provision' may . . . warrant the conclusion 'that the [] agreement is permeated by an unlawful purpose. [Citation.]' (*Ibid*.; [citation].)

"In a third and perhaps more practical test, courts will find a contract permeated by illegality or unconscionability when 'there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement.' (*Armendariz, supra*, 24 Cal.4th at pp. 124–125.) In such situations, 'the court would have to, in effect, reform the contract, not through severance or restriction, but by augmenting it with additional terms.' (*Id*. at p. 125.) Courts have no power to cure illegality by reformation or augmentation. (*Ibid*.) The only way a

court can cure a contract's illegality is 'through severance or restriction.' (*Ibid.*)  If the taint of illegality cannot be removed by those means, the court 'must void the entire agreement.'  (*Ibid.*)" (*Abramson, supra*, 115 Cal.App.4th at pp. 559–660.)

2.    <u>Analysis</u>

Netflix's public policy arguments appear to conflate two separate issues:  (1) whether five challenged contract provisions in the Waltenberg and Flynn agreements violated statutes and/or public policy, rendering the fixed-term provisions unenforceable; and (2) whether Fox's contracting practices generally violated statutes and/or public policy, rendering the fixed-term provisions of such contracts unenforceable.  We address each issue separately.

a.    Offending Provisions

i.    *Fixed-term provision*

Netflix suggests that the fixed-term provisions of the Waltenberg and Flynn agreements violate public policy because they operate to restrict an employee's right to move freely within the marketplace to find more favorable employment.  We disagree.  As our Supreme Court recently observed, there are public policy benefits to fixed-term contracts:  "When parties enter a contract not terminable at will, they cement their bargained-for intentions in accordance with the terms of that contract into the future.  The concreteness of this relationship means that contracting parties as well as other entities may

22

structure their decisions, invest resources, and take risks in reliance on it.  It is precisely this 'exchange of promises resulting in such a formally cemented economic relationship [that courts have] deemed worthy of protection from interference by a stranger to the agreement.'  [Citation.]  'Intentionally inducing or causing a breach of an existing contract is therefore a wrong in and of itself.'  [Citation.]" (*Ixchel, supra*, 9 Cal.5th at p. 1146.)  Thus, there is nothing about the fixed-term provisions themselves that would have rendered the Waltenberg and Flynn agreements unenforceable.

ii.    *Other provisions*

Our analysis of Netflix's public policy challenges based on the other provisions of the Waltenberg and Flynn agreements begins with the premise that the fixed-term provisions of those agreements are not only presumptively lawful, but also consistent with sound and established public policy.[9]  To overcome this presumption, Netflix relies on four different provisions in those agreements—the unilateral option and the injunctive relief, nonsolicitation, and confidentiality provisions—and argues that, individually or collectively, those provisions operate to invalidate the fixed-term provision as an unlawful restraint on employee mobility.

Fox's unilateral option to extend the Waltenberg and Flynn agreements does not, on its face, violate public policy.  It allowed Fox, during the employee's current agreement, to extend the

---

[9]    The Labor Code expressly recognizes and governs the use of fixed-term agreements in the employment context.  (Lab. Code §§ 2922, 2924, 2925, and 2855.)

23

stability and predictability of the parties' economic relationship for a period of two years.  Thus, like the fixed-term provision itself, the option is consistent with public policy.  Moreover, it does not purport to restrain either employee *after* he or she leaves Fox and therefore does not contravene section 16600.  (See *Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 509.)

But even if we assume that the option provisions in the Waltenberg and Flynn agreements violated public policy, they could have been severed or limited without affecting the fixed-term provision or any other material provision in the agreements, such as the employee's title, salary, or bonus during the two-year term of the agreement.  Although the elimination of the option would have adversely affected Fox's right *to extend* the future stability and predictability of the parties' economic relationship, it would have had no effect on the two-year term, which would have remained enforceable without any modification to or rewriting of the agreements.  And, to the extent the option provision could have been used to extend Flynn's agreement beyond seven consecutive years in violation of Labor Code section 2855, severance of the offending option period would have cured any potential violation without affecting the two-year base term of her agreement.

Netflix counters that the doctrine of severability is "inapplicable" because the Waltenberg and Flynn agreements are "at an end" and thus there is no contractual relationship to be preserved by severance.  But the focus of Netflix's public policy argument is on the validity of the agreements *at the time Netflix interfered with them*.  In other words, Netflix contends that, prior to its interference, the fixed-term agreements were unlawful,

making Waltenberg and Flynn the equivalent of at-will employees, i.e., fair game for solicitation.

Netflix next argues that severability could not have saved the fixed-term provisions because the other offending provisions on which it relies must be viewed "in tandem" and therefore "[s]evering an individual contractual provision would be particularly unlikely to cure the taint of illegality . . . ." But Netflix offers no persuasive argument as to why severance of a given offending provision, like the unilateral option, could not have been accomplished without affecting the core purpose of the fixed-term agreements.

Similarly, even if we assume the injunctive relief provision violated public policy by purporting to authorize specific performance of a personal services agreement, it could also have been severed without affecting the core purpose of the two-year term agreements. Severance would have affected one form of relief available to Fox in the event of a breach, but it would not have left Fox without a remedy, i.e., contract damages.

Likewise, the nonsolicitation provision,[10] which was unrelated to the fixed-term provision, could also have been severed to the extent it unfairly restrained Waltenberg and Flynn from competing with Fox for two years after they left its employment. Even without those provisions, the stability and

---

[10] Netflix also argues that the no-shop provision violated public policy by unfairly restricting current fixed-term employees from exploring other job opportunities during the majority of their fixed term of employment. But neither Waltenberg nor Flynn was subject to that provision; and, in any event, it was unrelated to the duration of the affected employees' fixed-term agreements and could be severed from those agreements without affecting their core purpose.

predictability of the parties' basic economic relationship would have remained in full force and effect for the agreed upon two-year term.

Finally, the confidentiality provision—which did not violate public policy on its face—could also have been severed, with no impact on the core purpose of the Waltenberg and Flynn agreements. It had a discrete subject matter—nondisclosure of confidential and trade secret information—unrelated to the basic economic relationship of the parties during the two-year term. Thus, that relationship, and in particular the stability and predictability of it during the defined term, would have been unaffected by the deletion of the confidentiality provision.

### b. Contracting Practices

Netflix complains of the "anticompetitive effect of the interlocking array of mobility-reducing practices Fox imposed on Flynn and Waltenberg." It asserts that Fox "locked" in both employees by using unilateral options to control whether and when they could leave the company. It also claims Fox routinely "strong-arm[ed]" employees, like Flynn, into signing new fixed-term agreements before the term of their existing agreement had expired. And, Netflix maintains that Fox threatened to bar employees, like Flynn, from leaving by threatening to enforce the fixed-term provisions.

Contrary to the implication of Netflix's "contracting practices" defense, the evidence showed that both Waltenberg and Flynn were sophisticated business executives who negotiated their fixed-term employment agreements with Fox at arm's

length.[11]  Therefore, there is nothing in the record to suggest that the timing of the relevant negotiations—i.e., during the term of the existing agreement—constituted an unlawful restraint on employee mobility or other public policy violation.  Indeed, there is at least one legitimate business reason for the timing of negotiations that is unrelated to "strong-arm" tactics, namely, a desire to communicate Fox's interest in retaining an employee before the employee seeks employment elsewhere.  Given the public policy favoring the stability and predictability of fixed-term employment relationships, the timing of the Waltenberg and Flynn negotiations did not rise to the level of a policy violation that rendered those agreements unenforceable.

Similarly, even if we assume that Fox conditioned promotions, salary increases, or bonuses for either Waltenberg or Flynn on their willingness to agree to a new fixed-term contract, such conduct would be consistent with a desire to continue the stability and predictability of the parties' economic relationship.  Fox's ability to offer, and an employee's ability to demand, promotions and increased pay are bargaining levers that are typically negotiated as terms of an employment agreement.  Netflix does not adequately explain how such negotiating conduct contravenes public policy.

Finally, even if we assume that Fox threatened to enforce its contract rights under the fixed-term agreements upon

---

[11]    Although Netflix asserted an unconscionability defense contending, among other things, that the Waltenberg and Flynn agreements were procedurally unconscionable, the trial court ruled that Netflix had failed to demonstrate a triable issue on that defense, and Netflix does not challenge that ruling on appeal.

27

learning of Waltenberg's or Flynn's imminent departure, that conduct does not rise to the level of a public policy violation sufficient to render the fixed-term agreements invalid. Like the other conduct upon which this defense is based, threats to sue employees who admittedly intend to breach their agreements would seem to be within Fox's legitimate interests in vindicating otherwise valid contract rights.

E. *Justification Defense*

Netflix next argues that its justification defense to its intentional interference with the Waltenberg and Flynn agreements requires a fact-specific inquiry that should have been allowed to go to the jury.

1. <u>Legal Principles</u>

"As a general rule interference with contractual relations is justifiable when a person seeks to protect an interest of greater social value than that attached to the stability of the contract involved. [Citation.] Restatement, Torts, section 767, suggests that in determining justification a court must balance the social interest in the protection of the expectancy (contract) against the social interest in the preservation of the actor's freedom of action (interference with another's contract)." (*Bledsoe v. Watson* (1973) 30 Cal.App.3d 105, 108.)

"Justification is determined by examination of the factors of: '(a) the nature of the actor's conduct, (b) the nature of the expectancy with which his conduct interferes, (c) the relations between the parties, (d) the interest sought to be advanced by the

28

actor and (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.' (Rest., Torts, § 767.)" (*Winn v. McCulloch Corp.* (1976) 60 Cal.App.3d 663, 673 (*Winn*).)

2. <u>Analysis</u>

Netfix's justification defense is premised on its assertion that by interfering with the Waltenberg and Flynn agreements, it was promoting those employees' interests in mobility in the job market. The record, however, does not suggest that the objective Netflix sought to advance by its intentional interference was the ability of Waltenberg or Flynn to move more freely within the job market. To the contrary, the undisputed evidence suggests that Netflix's primary, and perhaps sole, objective in targeting the two employees and doubling their under-market salaries was to obtain their services and, in the process, gain a competitive advantage over Fox and other production companies.

Moreover, by voluntarily agreeing to abide by the fixed term of their agreements, Waltenberg and Flynn gave up their respective rights to move freely within that market, at least temporarily, in favor of the economic stability and predictability that their contracts provided. Their commitment to a two-year term of employment, in turn, gave rise to a legitimate expectancy in Fox that warranted protection under established public policy. Thus, Netflix's interference could not be justified as promoting an interest or right that the targeted employees had voluntarily relinquished.

Finally, we compare the social interest of protecting Fox's expectancy interest against Netflix's freedom of action (*Winn*,

29

*supra*, 60 Cal.App.3d at pp. 672–673) and observe that "*a competitor's stake in advancing his own economic interest will not justify the intentional inducement of a contract breach* [citation], whereas such interests will suffice where contractual relations are merely contemplated or potential.  [Citation.]" (*Environmental Planning & Information Council v. Superior Court* (1984) 36 Cal.3d 188, 194.)  Thus, the social interest in protecting Fox's legitimate expectancy of stable and predictable economic relationships outweighs any arguable competitive interest that could have been advanced by Netflix's interference.

F.     *Cross-Claims*

Netflix additionally contends that the trial court erred by summarily adjudicating its UCL and declaratory relief cross-claims[12] based on the indispensable party doctrine.  According to Netflix, the court abused its discretion by determining that Netflix had failed to join indispensable parties, namely, the Fox

---

[12]     Netflix sought "a declaration that Fox's contracting practices constitute unfair, unlawful, and/or fraudulent business practices;" "an order enjoining Fox from continuing to use or enforce fixed-term employment agreements or other restraints of trade against its employees in California;" a "declaration that fixed-term employment agreements with Fox employees are unenforceable . . . and may not be used to prevent these individuals from seeking employment with other companies, including Netflix;" and "a declaration that Fox is estopped from enforcing fixed-term employment agreements to prohibit Fox's employees from employment with other companies, including Netflix . . . ."

30

employees whose fixed-term agreements would be impacted by the injunctive and declaratory relief sought by the cross-claims.

## 1. Legal Principles

"In civil litigation generally, the question whether a person must be joined as a party to a suit is governed by the compulsory joinder statute, section 389 of the Code of Civil Procedure [(section 389)]. Subdivision (a) of that statute states: 'A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.' ([ ] § 389, subd. (a).) If such a person (sometimes called a 'necessary' party) cannot be joined, subdivision (b) requires the court to consider 'whether in equity and good conscience' the suit can proceed without the absent party, or whether the suit should instead be dismissed without prejudice, 'the absent person being thus regarded as indispensable.' (*Id.*, subd. (b).) To make that judgment, the statute instructs the court to consider several factors, including: (1) the extent to which 'a judgment rendered in the person's absence might be prejudicial to him or those already parties'; (2) 'the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the

31

prejudice can be lessened or avoided'; (3) 'whether a judgment rendered in the person's absence will be adequate'; and (4) 'whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder.' (*Ibid.*)" (*Bianka M. v. Superior Court* (2018) 5 Cal.5th 1004, 1016–1017 (*Bianka M.*).)

"Because the determination of whether a person or entity must be joined as a party to a civil action is a case-specific inquiry that '"weighs 'factors of practical realities and other considerations,'"' a trial court's ruling on joinder is reviewed for abuse of discretion." (*Bianka M., supra*, 5 Cal.5th at p. 1018.)

2.      Analysis

Netflix initially contends the trial court abused its discretion because it "ignored" the statutory factors it was required to consider in making its indispensable party determination. Although a trial court may abuse its discretion by failing to consider all of the statutory factors that define and limit that discretion, its ruling "need not specifically state that it has considered all of the relevant factors . . . ." (*Dubois v. Corroon & Black Corp.* (1993) 12 Cal.App.4th 1689, 1696.) Thus, that the court did not recite the four indispensable-party factors does not, by itself, establish an abuse of discretion.

In any event, the facts of this case demonstrate that there was no abuse of discretion. The Fox employees with fixed-term agreements that would be affected by the requested injunction and declaration of rights were necessary parties to the cross-claims. Their interest in the stability and predictability of their employment relationship, as provided by the fixed-term

32

provision, could be impeded or impaired by an injunction that prevented Fox from using or enforcing fixed-term agreements that, among other things, set compensation and benefits for a predictable period of time. Similarly, a declaration that Fox's fixed-term agreements were unfair, unlawful, and fraudulent would, in effect, convert the affected employees' contracts to at-will relationships, thereby depriving them of the benefits of fixed-term agreements, such as Labor Code section 2924's prohibition against discharging fixed-term employees, except in cases of willful breach of duty, habitual neglect of duty, or incapacity.

In its opening brief, Netflix nonetheless claims that the employees are not necessary parties because Fox, a joined party, has the "same interest" in the litigation of Netflix's cross-claims as its employees who seek to preserve the validity of their fixed-term agreements. But, as noted, the employees' interest in job security and a predictable future income stream would not necessarily be an interest that Fox would advance in defense of the cross-claims. To the contrary, Fox could take the position that, if the court declares the fixed-term agreements to be at-will relationships, the affected employees' compensation should be reduced to reflect that fundamental change in the parties' relationship. Thus, absent joinder of the affected employees, their economic interests could be adversely impacted by the litigation without their participation.

In its reply brief, Netflix also contends that it would adequately represent the interest of those employees that wanted to leave Fox prior to the expiration of their fixed-term agreements. Although Netflix's interest may coincide with the interest of those Fox employees that Netflix sought to hire—i.e., both Netflix and the affected employees would wish to void the

33

fixed-term—Netflix's interest would not more generally coincide with the interest of all Fox employees in California, who neither desired to void the terms of their employment agreements nor were deemed desirable recruits by Netflix. Those employees' interest in job security and a predictable future income stream would not be an interest Netflix would advance in its pursuit of a declaration deeming all such contracts unenforceable.

Netflix further maintains that, even if the Fox employees were necessary, each of the statutory factors weighs against finding them indispensable. According to Netflix, any judgment on its cross-claims rendered in the employees' absence would be "minimally prejudicial" to them. But, as explained, a declaration that converted all of Fox's fixed-term agreements to at-will relationships would substantially prejudice those employees who wanted to preserve the predictable future income stream and job security of a fixed-term relationship.

Netflix next argues that, to the extent there may be potential prejudice from an injunction or declaration, those remedies could be shaped to reduce or avoid the prejudice. But other than suggesting that a declaration could be limited to Netflix's rights vis-à-vis Fox only, Netflix provides no other measures by which potential prejudice could be avoided. Regardless of whether the declaration is limited to Netflix's rights against Fox, the nature and extent of the relief sought under the cross-claims could necessarily effect the legitimate interests of the employees in their fixed-term agreements. Even an adjudication and declaration of only the parties' respective rights could result in the conversion of the affected employees' relationship from one for a specified term to an at-will

34

relationship, as those terms are used and understood under the Labor Code.

Netflix also complains that it will be prejudiced by a finding that the Fox employees are indispensable because it will not have an alternative remedy if its cross-claims against Fox are dismissed, but it does not provide support for that conclusion. To the extent Netflix is suffering actual harm from Fox's alleged business practices, it fails to address why an action at law for damages could not be maintained to vindicate its rights without impeding or impairing the interests of Fox's employees. And, even assuming that the UCL and declaratory relief cross-claims are the only viable means by which Netflix can vindicate its rights against Fox, it was Netflix's decision to file the cross-claims without involving the affected employees in the action.

Finally, we do not agree that the trial court can enter an adequate judgment in the absence of the employees. If the employees are not bound by any judgment entered against or in favor of Fox, they will be free to subsequently sue Fox for breach of contract and violations of the Labor Code, thereby exposing Fox to inconsistent judgments. (*Lee v. Rich* (2016) 6 Cal.App.5th 270, 277 ["An indispensable party is not bound by a judgment in an action in which the indispensable party was not joined and may collaterally attack the judgment"].)[13]

---

[13]    Because we affirm the ruling on the cross-claims on indispensable party grounds, we do not reach Netflix's contentions on the trial court's alternative ruling on those claims based on standing.

G.     *Injunction Against Solicitation*

In its opening brief, Netflix maintains that, even if the trial court properly granted summary adjudication of Fox's UCL claim, the injunction entered on that order must be reversed because it violates the prohibition against specific performance of personal services contracts.  Relying on *Beverly Glen Music, Inc. v. Warner Communications, Inc.* (1986) 178 Cal.App.3d 1142 (*Beverly Glen*), Netflix maintains that the injunction effectively prohibits Fox employees who wish to work for Netflix from making that change and results, in practical effect, in a decree of specific performance of their fixed-term agreements.  And, in its reply brief, Netflix also suggests that the injunction is vague and overbroad because its blanket prohibition against any solicitation puts Netflix at risk of contempt for "taking *any* action to hire a fixed-term employee who wants to leave Fox."

1.     <u>Background</u>

At the November 25, 2019, hearing on Fox's motion on the UCL claim, Netflix's counsel stated that she had "serious concerns" about the proposed "form" of the injunction.  According to counsel, the injunction presented "risks of foreclosure of First Amendment rights and [was] too vague to make clear what is actually being enjoined."  In response, the trial court encouraged counsel to "[g]o on with that thought, please," but counsel moved on to another topic.

Later in the argument, Netflix's counsel argued that, under Fox's employment contracts, "the employees don't have any choice about where they work as soon as they sign on the dotted

36

line." In response, the trial court and Netflix's counsel engaged in the following exchange: "The Court: Let me give you a hypothetical and a response to that last comment. [¶] Suppose they quit, and they decide to go down the street to a competitor; that they weren't solicited. They just went in and said, 'I would like to interview for a job.' [¶] [Netflix's Counsel]: So Your Honor, that doesn't happen often because . . . it's well understood in the working community that you're in a better position to get a new job when you're currently employed. It's very difficult to persuade a new employer that the reason you're unemployed is by choice. [¶] The Court: Understood. But I think your scenario is a little overbroad when you say they don't have a choice to go somewhere else. And the injunction that I'm proposing wouldn't cover that scenario."

Netflix's counsel then asserted that she was unsure about the meaning of "'not solicited[,]'" prompting the trial court to advise that, if counsel thought the term was ambiguous, the court and counsel could "tinker with [the wording of the injunction] a little bit." Counsel replied that Netflix did not "believe that an injunction should issue under any circumstances." Counsel then reiterated that she thought the injunction was overbroad or vague, but, because she only had "an hour to think about" the issue, it was "a little difficult . . . to give chapter and verse on why [Netflix thought it was] vague." The court offered counsel "more time to think about [the issue] if [she thought it was] necessary," but counsel declined the offer and moved on to discuss another issue.

Later in the hearing, the trial court and Fox's counsel also discussed the scope of the injunction. "[Fox's Counsel]: So I heard your comments about tweaking the scope of the injunction.

37

I would really caution the court not to do that. I think the court has it exactly right . . . . [¶] The Court: I wasn't suggesting [that] I was going to. But I was just suggesting that I have an open mind to hear suggested revisions. I think it's right the way it is." Fox's counsel concluded his arguments on the issue by stating, "I think you have it exactly right. Everybody knows what 'solicit' means and certainly everybody knows what inducing breach of contract means. [¶] So I would submit on the tentative exactly word for word as it's written." Although the court afforded Netflix's counsel the opportunity to respond, she did not return to the issue of the scope of the injunction, choosing instead to address other topics.

At the end of the hearing, the trial court offered Netflix's counsel another opportunity to address the scope of the injunction, asking, "Any last words about the scope of the injunction? You raised it, but you really didn't address it." Counsel again declined the opportunity to further explain Netflix's position, responding that she had "[n]othing further at this time."

### 2. Legal Principles

"'A permanent injunction is an equitable remedy for certain torts or wrongful acts of a defendant where a damage remedy is inadequate. A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate.' [Citation.]" (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1166–1167.)

Business and Professions Code section 17203, which authorizes injunctive relief for violations of the UCL, provides in part: "The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

The remedial power granted under this section is "extraordinarily broad. Probably because . . . unfair business practices can take many forms, the Legislature has given the courts the power to fashion remedies to prevent their 'use or employment' in whatever context they may occur." (*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 972.) The court's power "necessarily includes the authority to make orders to prevent such activities from occurring in the future." (*Id.* at p. 973.) Injunctive relief "may be as wide and diversified as the means employed in perpetration of the wrongdoing." (*People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 536.) We ordinarily review the issuance of a permanent injunction for abuse of discretion. (*Upland Police Officers Association v. City of Upland* (2003) 111 Cal.App.4th 1294, 1300.)

3. <u>Analysis</u>

a. Scope of injunction: forfeiture

Although Netflix's counsel complained at the summary judgment hearing that the proposed injunction was vague or

overbroad, she declined the trial court's invitation to explain her position on the issue, even after being offered more time to consider it.  And, when the court suggested that it would consider modifications to the language of the proposed injunction, counsel failed to propose any change, arguing instead that no injunction should issue.  Later in the hearing, when the court reiterated that it had an open mind to hear suggested revisions, counsel again failed to propose any changes.  Having been given ample opportunity at the hearing to persuade the court on whether the scope of the injunction should be modified, Netflix cannot now claim on appeal that the court abused its discretion by fashioning a vague or overbroad injunction.  (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.)[14]

---

[14]     Even though Netflix declined the trial court's invitation to suggest modifications to the injunction, the court's order included at least one modification to Fox's requested relief.  In its written ruling, the court found that "Netflix [was] likely [to] continue to solicit employees subject to [f]ixed-[t]erm [e]mployment [a]greements with Fox and/or induce such employees to breach their [f]ixed-[t]erm [e]mployment [a]greements with Fox, *without making a proper determination as to whether each separate [f]ixed-[t]erm [e]mployment agreement violates [various statutes] and/or is unconscionable*." (Italics added.)  It then ordered that the injunction applied only to employees who were subject to "*valid* [f]ixed-[t]erm [e]mployment [a]greements."  The injunction therefore does not preclude Netflix from soliciting employees who are subject to any fixed-term agreements that contain contractual provisions that are not at issue in this litigation and are otherwise unlawful.

### b. Legal validity

Netflix's assertions about the legal validity of the injunction are belied by the terms of that decree. The injunction does not restrain Fox employees from leaving Fox at any time, even during the fixed term of their agreement, subject only to a potential claim for breach of contract. By its express terms, the injunction restrains only Netflix; it proscribes only solicitation or inducement *during the fixed term* of an employee's agreement. Netflix thus remains free to solicit lawfully Fox's at-will employees and to hire Fox fixed-term employees at the end of their contract term. Netflix can also hire Fox employees during the fixed term, if the employee initiates the contact with the company without inducement or other act of interference by Netflix. Thus, contrary to Netflix's characterization, the injunction does not directly or indirectly decree specific performance of any fixed-term personal services agreement with Fox.

We also conclude that Netflix's reliance on *Beverly Glen, supra*, 178 Cal.App.3d 1142 is unavailing. There, a singer signed a recording contract with the plaintiff recording studio. (*Id.* at p. 1143.) During the term of the contract, the defendant recording studio offered the singer a "better deal" which she accepted as she was "having some difficulties" with the plaintiff. (*Id.* at pp. 1143–1144.) In response, the plaintiff first sued the singer to enjoin her from performing for any other studio, but the trial court denied the injunction based on the prohibition against specific performance of personal services contracts, and the plaintiff thereafter dismissed the action. (*Id.* at p. 1144.)

41

The plaintiff then sued the defendant studio seeking to enjoin it from employing the singer. (*Beverly Glen, supra*, 178 Cal.App.3d at p. 1144.) The trial court once again denied the requested injunction, ruling that the plaintiff could not accomplish indirectly, by enjoining the defendant, what it failed to accomplish directly in its suit against the singer. (*Ibid.*)

The Court of Appeal in *Beverly Glen, supra*, 178 Cal.App.3d 1142 affirmed the denial of the injunction against the defendant studio, holding that "if [the defendant studio's] behavior has actually been predatory, [the] plaintiff has an adequate remedy by way of damages. An injunction adds nothing to [the] plaintiff's recovery from [the defendant studio] except to coerce [the singer] to honor her contract. Denying someone [her] livelihood is a harsh remedy. The Legislature has forbidden it but for one exception. To expand this remedy so that it could be used in virtually all breaches of a personal service contract is to ignore over 100 years of common law on this issue." (*Id.* at p. 1145.)

Here, unlike in *Beverly Glen, supra*, 178 Cal.App.3d 1142, Fox did not seek to enjoin Netflix from hiring either Waltenberg or Flynn, so as to specifically enforce their fixed-term agreements. It sued under the UCL to enjoin Netflix from *future* solicitation of its fixed-term employees. As explained, the injunction under the UCL does not indirectly result in the specific performance of the affected employees' fixed-term agreements, as they are free under that decree to leave Fox during the term of their agreements for other employment, even at Netflix, so long as they are not solicited or induced by Netflix to leave. Thus, because the injunction sought in *Beverly Glen* would have had the effect of forcing the singer to specifically perform her agreement with the plaintiff, that case does not prohibit the injunction here

42

which enjoins future predatory business practices by a competitor, but without compelling the affected employees to perform for the full term of their existing agreements.

## V. DISPOSITION

The judgment is affirmed.  Plaintiffs are awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

MOOR, Acting P. J.

HOFFSTADT, J.

44